IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-02934-KLM

GARY L. HAYNES, for and on behalf of the Insurance Trust of trustee Marjorie Unger,

    Plaintiff,

v.

TRANSAMERICA CORPORATION, a member of Aegon Group, doing business as Transamerica Life Insurance Company,

    Defendant.

_____

## ORDER
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

    This matter is before the Court on Defendant's **Motion for Summary Judgment** [#84][1] (the "Motion"). Plaintiff filed a Response [#91] in opposition to the Motion, and Defendant filed a Reply [#92]. The Court has reviewed the Motion, the Response, the Reply, the attached exhibits, entire case file, and the applicable law, and is sufficiently advised in the premises. For the reasons set forth below, the Motion [#84] is **GRANTED**.[2]

## I. Summary of the Case[3]

    Plaintiff, as trustee of an insurance trust (the "Trust") established by Marjorie Ann Unger ("Ms. Unger"), asserts three claims seeking damages from Defendant, the insurer:

---

[1] "[#84]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

[2] Pursuant to 28 U.S.C. § 636(c) and D.C.COLO.LCivR 40.1(c), the matter has been referred to the undersigned for all purposes. *See* [#37].

[3] *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1186 (10th Cir. 2015) ("We . . . recit[e] all summary-judgment evidence in the light most favorable to . . . the nonmovant.").

(1) breach of contract, (2) common law bad faith, and (3) unjust enrichment. *See Am. Compl.* [#42].

Defendant issued Ms. Unger a universal life insurance policy (the "Policy") on October 8, 1985. *Def.'s Ex. A, Individual Life Insurance Policy* [#84-1]. The purpose of obtaining the Policy was to utilize the death benefits to pay anticipated capital gains taxes associated with her estate. *Def.'s Ex. B, Depo. of Gary Haynes* [#84-2] at 46-47. Not long after obtaining the Policy, it was transferred into the Trust. *Def.'s Ex. C, Insurance Trust Agreement* [#84-3]. In 1996, the Trust requested and received a maximum loan against the Policy. *Def.'s Ex. D, Request for Policy Loan* [#84-4]. Under the terms of the Policy, the policyholder could obtain a loan secured by its gross/cash value and the Policy would continue in effect so long as the gross/cash value minus the loan amount exceeded the monthly deduction due. *Def.'s Ex A.* [#84-1] at 9-10. The Policy also provides:

> Continuation of Insurance - - Between premium payments, this policy is automatically continued at the same face amount and with any additional benefits provided by rider, subject to the Grace Period provision and as explained in the Monthly Deduction section. . . .
>
> Grace Period for Paying Premiums - - If (1) the gross value minus any loan is less than the monthly deduction due, . . . we will notify you that a premium sufficient to keep this policy in force must be received within the grace period of 31 days from the date of the notice or this policy will lapse. . . .
>
> Termination of Insurance - - This policy will terminate on . . . the date of lapse.
>
> Lapse means termination of the policy due to insufficient premium or gross value.

*Id.* at 7-8.

Over the following twenty years, the loan was not repaid. *Def.'s Ex. B* [#84-2] at 55.

The loan was subject to annual advance interest of 7.4%.  *Def.'s Ex. A* [#84-1] at 3.

Plaintiff understood that interest continued to accrue on the loan and that it affected the net

cash value of the Policy.  *Def.'s Ex. B* [#84-2] at 66.  In 2009, Defendant began to issue

grace period notices to Plaintiff because the gross/cash value of the Policy minus the

increasing loan balance became less than the monthly deduction due and, therefore, an

additional premium was required to prevent the Policy from lapsing.  *Def.'s Ex. E, Notices

of Payment Due* [#84-5] (dated February 9, 2009; September 8, 2010; February 8, 2011;

April 8, 2011; October 10, 2011; October 8, 2013; April 8, 2014; June 9, 2014; August 8,

2014; October 8, 2014; February 9, 2015; April 8, 2015; June 8, 2015; August 10, 2015).

The letters all substantively included the following information:

> Your policy has entered its grace period and is in danger of lapsing.
>
> In order to prevent your policy from lapsing, we must receive a minimum
> payment of $[sum required] by [31 days after notice].  If the minimum
> payment is not received by [31 days after notice], your policy will lapse . . .
> .  A payment of a lesser amount will not prevent your policy from lapsing.

*Id.*  The Trust timely paid at least the minimum amount required in response to these grace

period notices to prevent lapse.  *Def.'s Ex. B* [#84-2] at 135-36.  These required premiums

were in addition to periodic semi-annual premium notices that Defendant systematically

provided to the Trust consistent with the terms of the Policy.  *Def.'s Ex. A* [#84-1] at 3;

*Notice of Premium Due* [#84-6] (dated October 8, 2011, and April 8, 2012).  In other words,

the semi-annual premium amount and grace period notices are wholly unrelated under the

terms of the Policy.  *Def.'s Ex. A* [#84-1] at 3, 8; *Def.'s Ex. L, Depo. of Abigail Reihle-

Hames* [#84-12] at 27-28, 70.

Specifically, the uncontested time line of notice and payment events from 2011 to

2015 is as follows:

On February 8, 2011, Defendant sent Plaintiff a grace period notice suggesting a payment of $4,639.29 to provide sufficient value to cover three monthly deductions, but requiring a minimum payment of $2,705.63. *Pl.'s Ex. 20* [#91-9]. On February 22, 2011, Defendant received a $4,639.29 premium payment from Plaintiff. *Pl.'s Ex. 12* [#91-7] at 2.

On April 4, 2011, Defendant received at $13,227.69 premium payment from Plaintiff. *Id.*

On August 8, 2011, Defendant sent Plaintiff a notice that it would "set the amount of your regularly scheduled premium billing at $13,365,37, effective 10/08/2011." *Pl.'s Ex. 9* [#91-6]. No payment was requested at that time. *See id.*

On October 10, 2011, Defendant sent Plaintiff a grace period notice suggesting a payment of $4,411.27 to provide sufficient value to cover three monthly deductions, but requiring a minimum payment of $2,311.41. *Pl.'s Ex. 22* [#91-10]. On November 1, 2011, Defendant received a $13,365.37 premium payment from Plaintiff. *Pl.'s Ex. 12* [#91-7] at 2.

On April 10, 2012, Defendant received a $13,365.37 premium payment from Plaintiff. *Id.*

On October 15, 2012, Defendant received a $13,365.34 premium payment from Plaintiff. *Id.* at 3.

On April 8, 2013, Defendant received at $6,500.00 premium payment from Plaintiff. *Id.*

On August 8, 2013, Defendant sent Plaintiff a notice that it would "set the amount of your regularly scheduled premium billing at $15,742.16, effective 10/08/2013." *Pl.'s Ex. 13* [#91-8]. No payment was requested at that time. *See id.*

On October 8, 2013, Defendant sent Plaintiff a grace period notice suggesting a payment of $5,551.35 to provide sufficient value to cover three monthly deductions, but requiring a minimum payment of $3,100.76. *Pl.'s Ex. 23* [#91-11]. On October 16, 2013, Defendant received a $6,500.00 premium payment from Plaintiff. *Pl.'s Ex. 12* [#91-7] at 3.

On December 3, 2013, Defendant received a $9,242.16 premium payment from Plaintiff. *Id.*

On April 8, 2014, Defendant sent Plaintiff a grace period notice suggesting a payment of $6,196.74 to provide sufficient value to cover three monthly deductions, but requiring a minimum payment of $3,746.14. *Pl.'s Ex. 25* [#91-12]. On April 22, 2014, Defendant received a $6,196.74 premium payment from Plaintiff. *Pl.'s Ex. 12* [#91-7] at 3.

On June 9, 2014, Defendant sent Plaintiff a grace period notice suggesting a payment of $5,470.23 to provide sufficient value to cover three monthly deductions, but requiring a minimum payment of $3,019.64. *Pl.'s Ex. 27* [#91-13]. On June 23, 2014, Defendant received a $5,470.23 premium payment from Plaintiff. *Pl.'s Ex. 12* [#91-7] at 3.

On August 8, 2014, Defendant sent Plaintiff a grace period notice suggesting a payment of $5,472.14 to provide sufficient value to cover three monthly deductions, but requiring a minimum payment of $3,021.55. *Pl.'s Ex. 28* [#91-14]. On August 25, 2014, Defendant received a $5,472.14 premium payment from Plaintiff. *Pl.'s Ex. 12* [#91-7] at 3.

On October 8, 2014, Defendant sent Plaintiff a grace period notice requiring a minimum payment of $3,208.79. *Pl.'s Ex. 29* [#91-15]. On November 3, 2014, Defendant received a $10,000.00 premium payment from Plaintiff. *Pl.'s Ex. 12* [#91-7] at 3.

On March 10, 2015, Defendant received a $8,000.00 premium payment from

Plaintiff.  *Id.*

On April 8, 2015, Defendant sent Plaintiff a grace period notice requiring a minimum payment of $2,849.34.  *Pl.'s Ex. 31* [#91-16].  On April 27, 2015, Defendant received a $5,000.00 premium payment from Plaintiff.  *Pl.'s Ex. 12* [#91-7] at 3.

On June 8, 2015, Defendant sent Plaintiff a grace period notice requiring a minimum payment of $3,746.23.  *Pl.'s Ex. 32* [#91-17].  On June 30, 2015, Defendant received a $5,000.00 premium payment from Plaintiff.  *Pl.'s Ex. 12* [#91-7] at 3.

On August 10, 2015, Defendant sent Plaintiff a grace period notice requiring a minimum payment of $4,644.84.  *Pl.'s Ex. 33* [#91-18].  On August 31, 2015, Defendant received a $5,000.00 premium payment from Plaintiff.  *Pl.'s Ex. 12* [#91-7] at 3.

On October 8, 2015, Defendant sent Plaintiff a grace period notice requiring a minimum payment by November 8, 2015, of $20,499.14.  *Pl.'s Ex. 35* [#91-19]; *see also Def.'s Ex. H, Def.'s Answers to First Set of Written Discovery* [#84-8] at 2-3 (noting that as of October 8, 2015, the Policy's cash value was $165,412.26 less the loan amount of $181,457.01, resulting in a net cash value of (-)$16,044.75, which was not above the monthly deduction of $2,582.75, as required by the Policy).  Consistent with prior notices, the October 8, 2015 notice stated in part, "Your policy has entered its grace period and is in danger of lapsing" and "[a] payment of a lesser amount will not prevent your policy from lapsing."  *Id.*  On October 29, 2015, Defendant received a $5,000.00 premium payment from Plaintiff.  *Pl.'s Ex. 12* [#91-7] at 3; *Def.'s Ex. I, October 15, 2015 Check* [#84-9].

Based on this underpayment, on December 8, 2015, Defendant informed the trustee that the Policy lapsed, stating: "Recently we notified you that additional premium was needed to prevent this policy from lapsing.  When the premium wasn't paid, the life

insurance coverage under this policy lapsed at the end of the grace period." *Def.'s Ex. J, December 8, 2015 Letter* [#84-10]. Thereafter, the Trust submitted a reinstatement application, but Defendant denied it based on Ms. Unger's medical condition under the provision of the Policy which states that reinstatement is subject to the insured continuing to be insurable under Defendant's standards. *Def.'s Ex. K, December 20, 2016 Letter* [#84-11]; *Def.'s Ex. A* [#84-1] at 8.

## II. Standard of Review

The purpose of a motion for summary judgment pursuant to Fed. R. Civ. P. 56 is to assess whether trial is necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Pursuant to Fed. R. Civ. P. 56(c), summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." An issue is genuine if the evidence is such that a reasonable trier of fact could resolve the issue in favor of the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the case under the governing substantive law. *Id.*

The burden is on the movant to show the absence of a genuine issue of material fact. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323). When the movant does not bear the ultimate burden of persuasion at trial, the "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] simply by pointing out to the [C]ourt a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.* at 671. If the movant carries the initial burden of making a prima facie showing of a lack of evidence, the burden

shifts to the nonmovant to put forth sufficient evidence for each essential element of his claim such that a reasonable trier of fact could find in his favor. *See Liberty Lobby*, 477 U.S. at 248; *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999). The nonmoving party must show the existence of a genuine dispute of a material issue by going beyond the allegations in its pleading and providing "specific facts showing there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. To satisfy its burden of providing specific facts, the nonmoving party must tender affidavits or other competent evidence. *Concrete Works, Inc. v. City & Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). Conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). The nonmoving party's evidence must be more than "mere reargument of [his] case or a denial of an opponent's allegation" or it will be disregarded. *See* 10B Charles Alan Wright et al., *Federal Practice and Procedure* § 2738 at 356 (3d ed. 1998).

### III.  Analysis

**A.    Claims One and Two: Breach of Contract and Common Law Bad Faith**

At the outset, the Court notes that the parties, and especially Plaintiff, inappropriately conflate Plaintiff's first two claims (breach of contract and common law bad faith) in such a manner as to make it difficult to determine the precise legal basis asserted for each claim.

However, after careful reading of the briefs and of the Amended Complaint [#42], the Court discerns three separate legal bases which Plaintiff may be attempting to assert as part of these first two claims.

### 1.    Breach of an Explicit Contract Provision

Under Colorado law, a claim for breach of insurance contract requires the following elements: "(1) the existence of a contract; (2) plaintiff's performance or some justification for nonperformance; (3) defendant's failure to perform; and (4) resulting damages to the plaintiff." *Myers v. Alliance for Affordable Servs.*, 371 F. App'x 950, 955 (10th Cir. 2010) (citing *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992)).

Defendant argues that Plaintiff's claim fails on the third element. *Motion* [#84] at 6-9. Although Defendant argues at length that it did not breach any explicit contract provision, it is far from clear that Plaintiff has based its breach of contract claim on the breach of an explicit provision. *See Response* [#91] at 10-12. In fact, Plaintiff does not point to any explicit provision of the contract which was breached. Regardless, to the extent Plaintiff may have been asserting this basis for his claim, the claim for breach of the insurance Policy fails because Plaintiff has "not identified any actual provisions" of the Policy or explained how Defendant breached those actual provisions. *See Snyder v. ACORD Corp.*, No. 14-cv-01736-JLK, 2016 WL 192270, at *12 (D. Colo. Jan. 15, 2016) (citing *Pernick v. Computershare Trust Co., Inc.*, No. 13-cv-02975-PAB-KLM, 2015 WL 5728880, at *12 (D. Colo. Sept. 29, 2015); *Conagra Trade Grp., Inc. v. Fuel Expl., LLC*, 636 F. Supp. 2d 1166, 1172 (D. Colo. 2009)).

Accordingly, to the extent Plaintiff's claim may be based on breach of an explicit contractual provision, summary judgment is entered in favor of Defendant.

### 2. Breach of Implied Duty of Good Faith and Fair Dealing

Under Colorado common law, every insurance contract "contains an implied duty of good faith and fair dealing." *Goodson v. Am. Standard Ins. Co. of Wis.*, 89 P.3d 409, 414 (Colo. 2004); *see also* Colo. Rev. State. § 10–1–101 (stating that "all persons having to do with insurance services to the public [shall] be at all times actuated by good faith in everything pertaining thereto"). "The good faith doctrine is necessary to effectuate the intentions of the parties and to honor their reasonable expectations." *Kaspryzk v. PNC Bank, Nat'l Ass'n*, No. 13-cv-00247-RBJ-KMT, 2013 WL 3895069, at *2 (D. Colo. July 29, 2013) (citing *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995)). "Good faith performance of a contract involves 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.'" *ADT Sec. Servs., Inc. v. Premier Home Prot., Inc.*, 181 P.3d 288, 293 (Colo. App. 2007) (quoting *Amoco Oil Co.*, 908 P.2d at 498). The doctrine "may be relied upon only when the manner of performance under a specific contract term allows for discretion on the part of either party." *Amoco Oil Co.*, 908 P.2d at 498. "Discretion in performance occurs 'when the parties, at formation, defer a decision regarding performance terms of the contract' leaving one party with the power to set or control the terms of performance after formation." *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006) (quoting *Amoco Oil Co.*, 908 P.2d at 498). "The good faith doctrine cannot be used to contradict terms or conditions for which the parties have bargained." *Kaspryzk*, 2013 WL 3895069, at *2 (citing *Amoco Oil Co.*, 908 P.2d at 498). "The doctrine does not obligate a party to accept a material change in the terms of the contract, or to assume obligations that vary or contradict the contract's express provisions, nor does it permit a party to inject substantive terms into the contract." *ADT Sec. Servs.,*

*Inc.*, 181 P.3d at 293.

Before the Court delves into the specifics of Plaintiff's claim, the Court notes that Plaintiff has not identified a specific contract term which allows for discretion in performance by Defendant, such that the implied duty of good faith and fair dealing would come into play. *See Kaspryzk*, 2013 WL 3895069, at *2 (holding that the plaintiff's claim of breach of the implied duty of good faith and fair dealing failed because the plaintiff "failed to identify a relevant discretionary term regarding the performance of her contract"). Further, the lapse of the Policy, pursuant to the terms of the contract, was automatic when Plaintiff did not pay the full minimum required amount pursuant to the grace period notice. *Def.'s Ex. A* [#84-1] at 8; *see Kaspryzk*, 2013 WL 3895069, at *3 (holding that "requiring [the defendant bank] to follow additional conditions to foreclose that were not bargained for by the parties would not effectuate the intentions of the parties"). Thus, it appears that Plaintiff's claim for breach of the duty of good faith and fair dealing fails at the outset as a matter of law and that, in the absence of a genuine issue of material fact, summary judgment in favor of Defendant is appropriate. However, in the interest of completeness, the Court also addresses the specifics of Plaintiff's claim.

Plaintiff asserts that "Defendant breached the implied duty of good faith by not properly communicating with the trustee there was a different requirement of payment that would be different from past payment history." *Response* [#91] at 10. This breach of the implied duty of good faith seems to be based on two theories: (1) Defendant's long-term course of conduct waived any right to object to Plaintiff's failure to fully pay the amount requested in the October 8, 2015 grace period notice, and (2) Defendant should have properly communicated with Plaintiff about any change in the payment system before

terminating the Policy.  *Response* [#91] at 10-12.

### a.    Defendant's Course of Conduct

Regarding Plaintiff's first theory, the evidence does not support a finding that Defendant's course of conduct regarding payment acceptance changed at any point. Plaintiff argues that Defendant should have permitted the amount required by the October 8, 2015 grace notice period, i.e., $20,499.14, to have been paid in installments, as it had done in the past.  *Response* [#91] at 10 ("The trustee should have been told in understandable terms that the amount called for [in the October 8, 2015 grace period notice] could not be paid in installments.").  However, even viewing the evidence in a light most favorable to Plaintiff, this argument lacks merit.  As outlined above, every other time a grace period notice was sent to Plaintiff requiring a minimum payment, Plaintiff paid that minimum amount, and usually more.  Such payments were made in February 2011, October/November 2011, October 2013, April 2014, June 2014, August 2014, October/November 2014, April 2015, June 2015, and August 2015.  There is not a single instance in the record where Plaintiff paid by installments on the minimum payment required by a grace period notice.  Accordingly, the Court finds that there is no genuine issue of material fact to the extent that Plaintiff's theory is based on Defendant's past course of conduct purportedly allowing the minimum payment required by a grace period notice to be paid in installments, and therefore summary judgment is appropriate in favor of Defendant.

### b.    Communications Between Plaintiff and Defendant

Plaintiff's second theory, that Defendant should have properly communicated with Plaintiff about any change in the payment system before terminating the Policy, also lacks

material evidentiary support.  Plaintiff points to two changes: (1) a change in wording on the grace period notices, and (2) an increase in the typical payment.

### i.      Wording of the Grace Period Notices

Regarding the change in wording on the grace period notices, Plaintiff has produced evidence that such a change occurred between the August 8, 2014 (and all prior) grace period notices sent to Plaintiff and the October 8, 2014 (and all subsequent) grace period notices sent to Plaintiff.  *Compare* [#91-14] *with* [#91-15].  Following is the language of the August 8, 2014 grace period notice, with the language that was *removed* in subsequent notices italicized:

> Your policy has entered its grace period and is in danger of lapsing.  The current accumulation value in your policy is not sufficient to cover the monthly deduction *for the cost of insurance due* OCT 08 2014.  *To continue coverage, we urge you to pay $5,472.14 which will, based on current rates, provide sufficient value to cover three monthly deductions.*
>
> In order to prevent your policy from lapsing, we must receive a minimum payment of $3,208.79 by NOV 08 2014.  If the minimum payment is not received by NOV 08 2014, your policy will lapse.  A payment of a lesser amount will not prevent your policy from lapsing.  A separate notification will be sent when the policy has lapsed.
>
> If *your policy is in its Required Premium Period,* you have an outstanding policy loan, *or the monthly deduction rates change on your policy,* additional amounts may be needed to extend coverage.  If this is the case, we will notify you separately.

[#91-14].  Following is the language of the October 8, 2014 grace period notice, with the language that was *added* in subsequent notices italicized:

> Your policy has entered its grace period and is in danger of lapsing.  The current accumulation value in your policy is not sufficient to cover the monthly deduction OCT 08 2014.
>
> In order to prevent your policy from lapsing, we must receive a minimum payment of $3,208.79 by NOV 08 2014.  If the minimum payment is not received by NOV 08 2014, your policy will lapse *and any and all benefits or*

-13-

*payments provided by your policy will be void and forfeited except as to the right to any cash surrender value or nonforfeiture benefit. A payment of a lesser amount will not prevent your policy from lapsing. A separate notification will be sent when the policy has lapsed.*

*If you have an outstanding policy loan, additional amounts may be needed to extend coverage. If this is the case, we will notify you separately.*

*If we receive a partial payment or if your payment is returned for any reason, the grace period and the date of lapse will not be extended. This notice supersedes any billing notices sent previously. If you have any questions about how much is due, please do not hesitate to contact our office.*

[#91-15]. In short, although language regarding the *requested* amount that would cover three monthly deductions was removed, language about the minimum *required* amount was unchanged except to the extent that the consequences of a failure to pay were more fully stated.

The uncontested record shows that between February 2011 and August 2014, Plaintiff only paid the exact *requested* amount four times (February 22, 2011; April 22, 2014; June 23, 2014; August 25, 2014). *Compare* [#91-9, #91-12, #91-13, #91-14] *with* [#91-7] at 2-3. For every other payment, Plaintiff either paid *more* than the requested amount or made a payment without first receiving a grace period notice (or, at least, without receiving a grace period notice that is in the record). Even after the grace period notice form changed in October 2014, Plaintiff continued to pay higher amounts than the minimum required. *See* [#91-7]. Prior to the final grace period notice of October 8, 2015, Plaintiff had received four of these notices [#91-15, #91-16, #91-17, #91-18] and timely paid all of them, seemingly without any issues arising from the change in notice language. Given this record, even viewing the evidence in a light most favorable to Plaintiff, the Court cannot find that a reasonable jury could find that Defendant breached its duty of good faith and fair dealing on the basis of the changed wording in the grace period notices which occurred a

year before the October 8, 2015 notice which Plaintiff did not fully pay.

### ii.    Increase in the Typical Payment Amount

Turning to the increase in the typical payment, the Court first notes that Plaintiff provides evidence that the minimum required payment did increase substantially in October 8, 2015. In October 2014, the minimum payment was $3,208.79. *Pl.'s Ex. 29* [#91-15]. In April 2015, the minimum payment was $2,849.34. *Pl.'s Ex. 31* [#91-16]. In June 2015, the minimum payment was $3,746.23. *Pl.'s Ex. 32* [#91-17]. In August 2015, the minimum payment was $4,644.84. *Pl.'s Ex. 33* [#91-18]. Then, on October 8, 2015, the minimum payment ballooned to $20,499.14. *Pl.'s Ex. 35* [#91-19].

However, the uncontested evidence shows that the minimum required payment amount listed on the grace period notices was calculated by Defendant's automated system. *See, e.g.*, *Pl.'s Ex. 1, Depo. of Abigail Reihle-Hames* [#91-2] at 92 ("[T]hese notices are generated by the system in accordance with the grace-period provision of the contract . . . and the system determines what amount is needed to bring the policy back in good standing."). The evidence is also uncontested that as of October 8, 2015, the Policy's cash value was $165,412.26, less the loan amount of $181,457.01, resulting in a net cash value of (-)$16,044.75, which, of course, was not above the monthly deduction of $2,582.75, as required by the Policy. *Def.'s Ex. H, Def.'s Answers to First Set of Written Discovery* [#84-8] at 2-3. There is no evidence before the Court that the minimum amount requested on October 8, 2015, ($20,499.14) in order to bring the Policy back into good standing (i.e., to bring the net cash value of the Policy to an amount greater than the monthly deduction) was incorrect. *Pl.'s Ex. 35* [#91-19].

Finally, the Court notes that the grace period notice sent to Plaintiff on October 8,

2015, is utterly clear that a minimum payment is due, that partial payments are insufficient to keep the Policy from lapsing, and that the insured should contact Defendant if there is any question over the minimum payment. *See* [#91-19]. There is no evidence that Plaintiff contacted, or even attempted to contact, Defendant after receiving his notice. Plaintiff argues that Defendant should have warned Plaintiff that a large payment would be required in October when Plaintiff spoke to Defendant in August, but there is no material evidence in the record before the Court regarding the purpose of the August phone call, what the parties talked about, whether it concerned upcoming payments, whether Defendant knew at that time that a large payment would be required in October, or any other information that would permit a jury to find that Defendant may have breached its duty of good faith and fair dealing with Plaintiff in connection with the August communication between the parties. The only evidence regarding this call is particularly unilluminating. Plaintiff stated in an affidavit:

> August 28, 2015 representative Shelly wanted Mrs. Unger's social security when the trust had its own social security number. John Unger was in town and on the phone. There was confusion as to the payments and the notices received. In the past where notices came in and Affiant made payments. [sic]. The explanations provided by the Defendant were confusing and there was a total lack of cooperation by the Defendant to inform me and John Unger of what was taking place as to the policy.

*Aff. of Pl.* [#91-1] at 2.

Plaintiff has provided no case in his favor with materially similar facts, and the Court has found none. Given this record, even viewing the evidence in a light most favorable to Plaintiff, the Court finds that a reasonable jury could not find that Defendant breached its duty of good faith and fair dealing on the basis of the increase in the typical payment required to keep the Policy in good standing.

Reading between the lines of the briefs, it appears that there may have been an August 10, 2015 notice (sent two days after the August 8, 2015 grace period notice) regarding the total amount of regularly scheduled yearly premium billing, similar to the notices provided in 2011, *see* [#91-7] (setting the regularly scheduled premium billing for $13,365,37 for the year but requiring no payment at that time), and 2013, *see* [#91-8] (setting the regularly scheduled premium billing for $15,742.16 for the year but requiring no payment at that time).[4]  Presumably in reference to this notice which has not been provided to the Court, Plaintiff states in his brief, without much additional context: "When the August 10, 2015 notice was received, both Mr. Unger and Mr. Haynes were on the phone with Defendant who did not explain why the notice was generated.  This is the time the Defendant failed in reasonable terms to explain what [was] required as to payment. The trustee should have been told in understandable terms that the amount called for in [the October 8, 2015 grace period notice] could not be paid in installments."  *Response* [#91] at 10.

What *appears* to have happened (although the Court makes no finding on this point) is that there may have been some confusion between the yearly regularly scheduled premium billing of $21,812.40 and between the grace period notice of $20,499.14, perhaps due to the similarity of these numbers.  However, as previously noted, the semi-annual premium amount and grace period notices are wholly unrelated under the terms of the Policy.  *Def.'s Ex. A* [#84-1] at 3, 8; *Def.'s Ex. L, Depo. of Abigail Reihle-Hames* [#84-12]

---

[4]  In fact, although stricken by the Court, *see Order* [#82], the Court notes that the expert witness report by Bradley Levin explicitly refers to this document.  *See* [#60-11] at 3 (stating that "[o]n August 10, 2015, in conformity with each of the prior communications from Transamerica, Mr. Haynes was advised that the 'regularly scheduled premium billing' was set at '$21,812.40, effective October 8, 2015'").

at 27-28, 70.

One of the problems here is the record does *not* contain the semi-annual premium notice or any material information regarding the purpose of the August 2015 telephone call or regarding what was said between Plaintiff and Defendant at that time. There is no material evidence that the October 8, 2015 grace period notice was confusing in its demand for a minimum payment of $20,499.14, or why, despite the explicit language in the notice stating that "[y]our policy has entered its grace period and is in danger of lapsing" and "[a] payment of a lesser amount will not prevent your policy from lapsing," Plaintiff thought he could pay this amount in installments. There is no evidence here that Plaintiff ever questioned Defendant about the payment amount required by the October 8, 2015 grace period notice. Under these circumstances, the Court simply cannot find that Plaintiff has demonstrated a genuine issue of material fact sufficient to withstand Defendant's motion for summary judgment regarding the asserted breach of the duty of good faith and fair dealing.

Accordingly, based on all of the foregoing, summary judgment is entered in favor of Defendant on Plaintiff's claim regarding the duty of good faith and fair dealing.

### 3. Common Law Bad Faith

"[A] separate action in tort [arises] when the insurer breaches its duty of good faith and fair dealing." *Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 342 (Colo. 2004) (en banc). When an insured sues the insurer in tort for bad faith breach of insurance contract, "the insured must prove that (1) the insurer acted unreasonably under the circumstances, and (2) the insurer either knowingly or recklessly disregarded the validity of the insured's claim." *Sanderson v. Am. Family Mut. Ins. Co.*, 251 P.3d 1213, 1217 (Colo. App. 2010);

*see Goodson*, 89 P.3d at 415 (citing *Travelers Ins. Co. v. Savio*, 706 P.2d 1258, 1274-75 (Colo. 1985)).

In the absence of holding that a genuine issue of material fact exists as to whether Defendant breached its duty of good faith and fair dealing, Plaintiff's claim for a separate action in tort in connection with the breach of contract claim fails as a matter of law. *See Allen*, 102 P.3d at 342 (stating that the insured and insurer's "special relationship gives rise to a separate action in tort *when the insurer breaches its duty of good faith and fair dealing*" (emphasis added). Accordingly, summary judgment in favor of Defendant is appropriate on this aspect of Plaintiff's claim.

Plaintiff may also be asserting common law bad faith in connection with Defendant's refusal to reinstate the Policy after the Policy had lapsed and after Plaintiff submitted a reinstatement application once his error regarding the minimum payment had been discovered. *Am. Compl.* [#42] ¶ 21(c). Defendant provides evidence that the Trust submitted a reinstatement application, but that the application was denied on the basis of Ms. Unger's medical condition. *Def.'s Ex. K, December 20, 2016 Letter* [#84-11]. The Policy stated that reinstatement of a lapsed Policy was subject to the insured's continuing insurability under Defendant's standards. *Def.'s Ex. A* [#84-1] at 8.

Plaintiff fails to address this argument at all in his Response [#91], which the Court could deem to concede the invalidity of this claim. *See, e.g.*, *Cayetano-Castillo v. Lynch*, 630 F. App'x 788, 794 (10th Cir. 2015) (citing *Velazquez–Perez v. Developers Diversified Realty Corp.*, 753 F.3d 265, 278-79 (1st Cir. 2014) (holding that employment-retaliation claim waived where the plaintiff failed to address the employer's argument against the claim); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) (holding that the failure

of the plaintiffs to file a brief addressing the defendant's argument amounted to a concession that their claim was meritless)). However, the Court simply notes that Plaintiff has failed to provide any evidence opposing Defendant's evidence in order to demonstrate that there is a genuine issue of material fact regarding the denial of reinstatement of the Policy. Accordingly, summary judgment in favor of Defendant on this issue is appropriate.

## B.    Claim Three: Unjust Enrichment

Plaintiff's third claim is for unjust enrichment. Plaintiff states that "[t]his claim can be asserted if Defendant received funds or took possession of funds that equity would require to be returned to the Plaintiff as the Defendant has benefited [sic] from an unfair detriment to the Plaintiff." *Response* [#91] at 11.

"Unjust enrichment is a quasi-contractual, equitable remedy designed to undo a benefit conferred on one party at the unfair expense of another party." *Scott v. Scott*, 428 P.3d 626, 636 (Colo. App. 2018). "Generally speaking, a person who is unjustly enriched at the expense of another is subject to liability in restitution." *Id.* (internal quotation marks omitted). "To prevail on an unjust enrichment claim, a party must prove that (1) the defendant received a benefit (2) at the plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." *Id.* (internal quotation marks omitted).

However, "[a]s a general rule, a party cannot recover for unjust enrichment as a matter of law where there is an express contract addressing the subject of the alleged obligation to pay." *Id.* at 636 n.6. Where that express contract is not between the parties to the civil action, "this general bar to an unjust enrichment claim is not applicable . . . ." *Id.* Here, however, the insurance contract at issue was in effect at all times when Plaintiff

was paying Defendant.  Plaintiff does not assert that Defendant benefitted from any payments made after Defendant cancelled the policy.  Thus, because there is an express insurance contract between the parties in this action which addresses the subject of Defendant's asserted obligation to pay, this claim fails as a matter of law.  *Scott*, 428 P.3d at 636 n.6.

Accordingly, judgment is entered in favor of Defendant and against Plaintiff on the unjust enrichment claim.

## IV.  Conclusion

Based on the foregoing,

IT IS HEREBY **ORDERED** that the Motion [#84] is **GRANTED**.  The Clerk of Court is directed to enter judgment in entered in favor of Defendant on all claims asserted in this matter.

IT IS FURTHER **ORDERED** that the joint Final Pretrial Conference, Jury Instructions Conference, and Trial Preparation Conference set for November 29, 2018, at 1:30 p.m. is **VACATED**.

IT IS FURTHER **ORDERED** that the three-day Jury Trial set to begin on February 4, 2018, at 9:00 a.m. is **VACATED**.

IT IS FURTHER **ORDERED** that the Clerk of Court shall **close** this case after entering final judgment in favor of Defendant.

Dated:  November 19, 2018

BY THE COURT:

Kristen L.  Mix
United States Magistrate Judge